SWEET SAGE CAFÉ, LLC,
JOHN MESSMORE, SHERMEE, LLC,
and SS16725, LLC,

     Plaintiffs,

v.                                 Case No. 8:18-cv-01080-T-02CPT

TOWN OF NORTH REDINGTON BEACH,
FLORIDA, and SHERIFF BOB GUALTIERI
in his official capacity as PINNELAS COUNTY
SHERIFF,

     Defendants.
_____/

## ORDER

     This case concerns alleged First Amendment retaliation through administrative code inspections and the constitutionality of a revised city ordinance authorizing such inspections. The matter comes to the Court on cross-motions for summary judgment from Plaintiffs, Dkt. 71, Defendant Town of North Redington Beach (the "Town"), Dkt. 73, and Defendant Sheriff Bob Gualtieri in his official capacity as Pinellas County Sheriff (the "Sheriff"), Dkt. 81. The parties have filed responses to the opposing motions. The Court **GRANTS** Plaintiffs' motion for

partial summary judgment, **GRANTS** the Sheriff's motion, and **GRANTS** and **DENIES** in part the Town's motion.

## BACKGROUND

Incorporated in 1953, the Town is a beachside community, one square mile in size, with approximately 1,427 full-time residents. Dkt. 82-6 at 48. A five-member Commission, including Mayor Queen, governs the Town. *Id.* at 53. The Town has four employees: Town Clerk Campbell, Deputy Clerk Schmader, Public Works Projects employee Lewis, and a groundskeeper. *Id.* at 48. Since 2013, the law firm Trask Daigneault has been "the retained Town Attorney," and Jay Daigneault of the firm has been appointed as the Town Attorney. Dkt. 82-8 at 3.

Plaintiff Sweet Sage Café, LLC ("Sweet Sage") operates a restaurant named Sweet Sage Café (the "Café") in the Town. Dkt. 56 at ¶ 3. Plaintiff Messmore owns and manages the Café with his wife. *Id.* The Café, which closes at 2:00 p.m., offers breakfast and lunch in a "casual Florida beach-themed setting." *Id.* It also features a gift shop. Dkt. 82-4 at 2.

The Café displayed various signs outside, including some for which Sweet Sage was issued a Notice of Violation (NOV) of a sign ordinance. Complaint, *Sweet Sage Cafe, LLC v. Town of N. Redington Beach, Florida*, 8:15-CV-2576-T-30JSS (M.D. Fla. Nov. 2, 2015), ECF: 1 at 3, 9. In November 2015, Sweet Sage sought a declaration that the Town's sign ordinance, adopted in June 2015,

violated the First Amendment. *Id.* at 9. On January 27, 2017, the district court entered summary judgment, agreeing that the ordinance was unconstitutional. *Sweet Sage Cafe, LLC*, 2017 WL 385756, at *1 (M.D. Fla. Jan. 27, 2017).

Sweet Sage has contested other Town ordinances as well. To confront its shortage of public parking, the Town has an off-street parking ordinance, Ordinance 2009-685, that requires at least one parking space for every four seats in an establishment. Dkt. 73-8 at 2-3. Before 2009, one space was required for every three seats. *Id.*; Dkt. 82-6 at 66. The new ordinance grandfathered the number of nonconforming seats as of September 10, 2009 but did not allow additional seats without additional on-site parking. Dkt. 73-8 at 3. To determine the grandfathered numbers, the Town's former code enforcement officer, Mr. Lewis, counted seats at the existing bars, lounges, and restaurants. Dkt. 82-6 at 67. The Town Clerk created a typed chart from the handwritten results, which was then included as an attachment to the ordinance. *Id.* at 18-20, 68. Mr. Lewis, along with Mr. Messmore, counted 61 seats at the Café. Dkt. 82-1 at 22.

In 2016, the Town contracted with the Sheriff to enforce code violations, including the parking ordinance. Dkt. 56-1. Deputy Clerk Schmader serves as the secretary for code enforcement, which includes typing up forms for the officer and taking and forwarding complaints. Dkt. 84-1 at 12. Beginning in July 2016, Deputy Joshua Short was the Town's code enforcement officer. Dkt. 82-3 at 2. In March or

April 2017, Corporal Chris Kohmann assumed code enforcement duties for the Town. Dkt. 82-2 at 2.

The code enforcement officer exercises some discretion in enforcing code violations. For example, only the officer is authorized to determine that a code violation has occurred and to issue a NOV. Dkt. 84-1 at 3, 25. The officer also determines the method by which notice is served, the length of time for compliance before the case is set for an enforcement hearing before the Special Magistrate, and whether compliance is met upon re-inspection. Dkt. 84-1 at 6. Deputy Short and Corporal Kohmann have visited the Café a number of times to assess compliance with the parking ordinance.

To apply for an annual business tax receipt (basically a business permit) from the Town, a restaurant, bar, or lounge must list its number of seats on the application. Dkt. 56-4 at 3. There is also an annual inspection. Dkt. 84-1 at 12. For seat counts at grandfathered establishments, Deputy Clerk Schmader gives the code enforcement officer a copy of the parking ordinance and "a copy of their business tax receipts to go to every restaurant." *Id.* at 12-13. Until the most recent application, since 2010 Mr. Messmore had attested on his business tax receipt applications that the Café has 61 seats, Dkt. 74-4 at 2-12, and had been issued an occupational license for the same, Dkt. 75-1 at 9-17.

A Special Magistrate hearing followed an April 19, 2018 NOV issued to the Café for noncompliance with the parking ordinance. Dkt. 75-2. On May 29, 2018, the Magistrate found that the Town failed to prove that the Café had exceeded its designated 61 seats. *Id.* at 14. The order "noted that nothing in the Town . . . Code . . . specifies a formula for calculating the number of seats based on the length of a bench seat." *Id.* at 10-11. In response, the Town adopted Ordinance 2018-801, which did not alter the grandfathered seating allotments. Dkt. 75-3; Dkt. 82-6 at 30-31; Dkt. 82-8 at 12-13. As represented by counsel at oral argument, litigation concerning the Town's parking ordinance is ongoing in the Florida state courts.

In 2016 Mr. Messmore, through Plaintiff Shermee, LLC, purchased a vacant lot approximately 150 feet north of the Café. Dkt. 82-5 at 14. He hoped to use the property as off-site parking for Café customers. *Id.*; Dkt. 82-4 at 5. "[H]e said that after 2:00 when [the Café] closed, then anybody could use it to park there to go to the beach. It was definitely for Sweet Sage up until 2:00 when they closed." Dkt. 82-6 at 65.

The Town's zoning code, however, did not allow parking as a primary use of property at the location. Dkt. 83-1 at 2. Mr. Messmore sought to rezone the lot. *Id.* at 6. The Town directed Mr. Messmore to section 98-3 of the Town Code, noting "You may want to check with your attorney for procedural steps." *Id.* At a November 10, 2016 Commission meeting, Mr. Messmore presented materials in

support of the rezoning. *Id.* at 20. According to a memorandum by the Town Attorney, no action was required based on the presentation.[1] *Id.* at 18-19. The Mayor scheduled a workshop for January 5, 2017 to discuss the proposal. *Id.* at 30.

At the workshop, the Commission conditioned the rezoning of the property on Mr. Messmore not adding "statuary, trellis[es], art or anything that draws attention to the parking area" to the lot. Dkt. 83-1 at 41. Mr. Messmore returned to the Commission on January 12, 2017 with paperwork including a draft of a rewritten ordinance. *Id.* at 42; Dkt. 82-6 at 59. The Mayor initially scheduled another workshop for February 7, 2017 that was later canceled. Dkt. 82-6 at 28. "[A]s the Commissioners came in and said, what's the workshop about and [Town Clerk Campbell] told them, they were like, why are we doing this, he's already said he doesn't agree to [the conditions] and he's already showed us at the last meeting he doesn't agree to it. So, they didn't want to do [another workshop]." *Id.* at 59-60.

Mr. Messmore abandoned the parking lot proposal and sought to build a new business on the lot called the Sugar Shack. Dkt. 82-6 at 62-63. This required two variances and the approval of a site plan, which was eventually completed. *Id.* at

---

[1] Under the Town's code, rezoning could be initiated by the Commission, recommended by the Planning and Zoning Board, or the owner could obtain signatures of support from 51% of the owners in the affected area. *Id.*; Dkt. 82-8 at 36.

63-64. The Commission approved the site plan with conditions, and Mr. Messmore has begun construction. Dkt. 82-5 at 14-15.

## PROCEDURAL HISTORY

On May 3, 2018, Plaintiffs filed their original complaint for First Amendment retaliation against the Town and unreasonable search and seizure against the Town and Sheriff. Dkt. 1 at 7-8. The next day Plaintiffs sent a letter to the Town advising it that officers could no longer enter the Café to conduct code enforcement inspections without a lawfully issued warrant. Dkt. 75-4 at 18. On May 10, 2018, the Town Attorney responded with a letter stating the Town's Business Tax Code permitted the officers to enter without a warrant. Dkt. 56-2. In response, Plaintiffs amended their complaint to challenge the constitutionality of the warrantless search provisions of the Business Tax Code. Dkt. 23 at 12. Plaintiffs also added a state law trespass claim against the Town and the Sheriff. Dkt. 23 at 14.

On October 11, 2018, the Town adopted Ordinance 2018-804 which amended the Town's Business Tax Code. Dkt. 75-4 at 2-11. According to the Town, the amendment's purpose was to address the warrantless inspection provisions subjected to constitutional challenge. Dkt. 82-8 at 32. The amendment authorizes, among others things, warrantless administrative inspections of businesses:

> [e]ngaged in a closely-regulated industry and where the
> inspector has a reasonable good faith belief, based upon a
> record of non-compliance or other verifiable evidence of
> probable non-compliance to include citizen complaints,
> that providing advance notice of the inspection may
> allow the business to conceal the code violation which is
> the subject of the inspection.

Code of the Town of North Redington Beach, Florida, § 66-45(c)(3). The

Code defines the term "closely regulated industry" as: "[a] firearms retailer . . . ;

[a] business which is licensed and regulated by the Florida Beverage Law as

defined in Florida Statutes § 561.01(6); and [a] public food service establishment

licensed under Florida Statutes Chapter 509." § 66-45(g). The record is clear there

is no firearms dealer in the Town and the Town does not actually regulate gun

dealers or the Florida Beverage Law.

     The Town also modified its business tax receipt application (effectively a

business permit) to require businesses to consent to warrantless inspections as a

condition of the "privilege of conducting business within the Town." Dkt. 84-1 at

19. The Town Attorney's office provided the revised application's language, which

is a mandatory component of the business tax receipt. *Id.* at 19-20; Dkt. 82-6 at 32-

34; Dkt. 82-8 at 34:

> By signing the below, the business owner/manage[r]
> acknowledges that all of the information on this Business
> Tax Receipt Application is true, and that as a condition of
> the privilege of conducting business within the Town,
> consent[s] to the Town's Code Enforcement Officer to
> periodically conduct inspections of the business premises

> during business hours to confirm the information
> provided in this Application is true, and to verify that the
> business is complying with Town code provisions
> governing the business's condition, conduct and
> operations, is hereby given.

Dkt. 84-1 at 18-19. Sweet Sage's most recent application did not include the seat number as required and was therefore rejected. Dkt. 56-4 at 3. Mr. Messmore has not refiled because he does not approve of the above consenting language. *Id.* ¶¶ 38-39.

On November 13, 2018, Plaintiffs once more amended their complaint to lastly challenge the constitutionality of the Town's Business Tax Code as amended by Ordinance 2018-804, both facially and as applied. Dkt. 56. After exhaustive discovery, Plaintiffs filed summary judgment on only the constitutionality of the Business Tax Code and business tax receipt application. The Town and the Sheriff move for summary judgment on all claims.

## SUMMARY JUDGMENT STANDARD

Under Rule 56, Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Mize v. Jefferson City Bd. of Educ.,* 93 F. 3d 739, 742 (11th Cir. 1996). If met, the burden shifts to the nonmoving party to "come forward with

specific facts showing that there is a genuine issue for trial." *Shaw v. City of Selma*, 884 F. 3d 1093, 1098 (11th Cir. 2018) (citation omitted).

"A fact is 'material' if it has the potential of 'affect[ing] the outcome of the case.'" *Shaw*, 884 F.3d at 1098. "And to raise a 'genuine' dispute, the nonmovant must point to enough evidence that 'a reasonable jury could return a verdict for [him].'" *Id.* (citation omitted) (alteration in original). The Eleventh Circuit further teaches that "[w]hen considering the record on summary judgment 'the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Id.* (citations omitted).

## DISCUSSION

Because factual issues on the First Amendment retaliation claim remain, summary judgment is inappropriate. Prospective relief against the Town and Sheriff for any Fourth Amendment or state law trespass violations is unwarranted. The Court finds that portions of the revised Business Tax Code in tandem with the business tax receipt application suffer constitutional defects. Lastly, the ordinance does not violate Florida law. The Court will handle Plaintiffs' claims in turn.

Count I.    <u>First Amendment Retaliation Against the Town</u>

Plaintiffs first claim the Town violated 42 U.S.C. § 1983 "by retaliating against Plaintiffs for the exercise and assertion of their rights under the First . . . Amendment[]." Dkt. 56 ¶ 41. Specifically, Plaintiffs "engaged in constitutionally

protected speech through the posting of signs on the premises of [the Café],

speaking at public hearings and communicating with the Town Clerk concerning

code enforcement matters," petitioning for "the redress of grievances by filing the

Sign Ordinance Litigation," and "when they asked the Town to change the

permitted uses for the vacant lot and applied for a variance from the Town's lot

size regulations." *Id.* ¶¶ 42-44. The alleged retaliatory actions included "repeated,

and often disruptive, code enforcement inspections" and amending its parking

ordinance and Business Tax Code. *Id.* ¶¶ 45-46. Plaintiffs seek damages, injunctive

relief, attorney's fees, and costs. *Id.* at 12.

1. The Relevant Policymaker Under *Monell*

A municipality is subject to § 1983 liability "when execution of a

government's policy or custom, whether made by its lawmakers or by those whose

edicts or acts may fairly be said to represent official policy, inflicts the injury."

*Monell v. New York City Dep't of Soc. Servs*., 436 U.S. 658, 694 (1978). A plaintiff

must demonstrate: "(1) that his constitutional rights were violated; (2) that the

municipality had a custom or policy that constituted deliberate indifference to that

constitutional right; and (3) that the policy or custom caused the violation."

*McDowell v. Brown*, 392 F.3d 1283, 1289 (11th Cir. 2004).

Liability may also be imposed for a "course of action tailored to a particular

situation" by municipal policymakers where "the decisionmaker possesses *final*

*authority* to establish municipal policy with respect to the action ordered." *Scala v. City of Winter Park*, 116 F.3d 1396, 1399 (11th Cir. 1997) (citations omitted) (emphasis in original); *see also Carter v. City of Melbourne, Fla.*, 731 F.3d 1161, 1167 (11th Cir. 2013). Indeed, "municipal liability under § 1983 attaches where— and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986) (citation omitted). To identity the relevant policymaking officials, "the court should examine not only the relevant positive law, including ordinances, rules and regulations, but also the relevant customs and practices having the force of law." *Rosario v. Miami-Dade Cty.*, 490 F. Supp. 2d 1213, 1221-22 (S.D. Fla. 2007) (citation omitted). This is a question of law for the Court. *Id.* (citation omitted).

The Court finds that, for the conduct complained of, the relevant policymaker for the Town is the Town Attorney in conjunction with the five-member Commission. Part of the Court's analysis is informed by the unique circumstances of the case: the Town has but four employees, a Commission of five members including the Mayor, and a Town Attorney who is very involved in the Town's affairs and provided for in the Town's Code. According to the Town Attorney, by charter his position makes him a city officer. Dkt. 90-4 at 7. Section

2-61 of the Town's Code further provides that the Town Attorney "shall either be counsel to the [code] enforcement board or shall represent the Town by presenting cases before the board . . . ."

There is record evidence that the Town Attorney represented, spoke on behalf of, and made discretionary decisions for the Town. In fact, the Town Attorney was designated and deposed as the corporate representative of the Town for a 30(b)(6) deposition under the Federal Rules of Civil Procedure related to this matter. Dkt. 82-8 at 2. There is, moreover, evidence that the Town Attorney was aware of the timing of some of the code enforcement against the Café, which coincided with his deposition, and that his firm "handled" code enforcement matters. He and his firm also had the authority to draft ordinances, which were later passed by the Commission, to allegedly target Mr. Messmore. The Commission, in turn, had the authority to pass ordinances as well as cancel workshops on zoning matters. Code of the Town of North Redington Beach, Florida §§ 1-12, 1-13.

The Town's reliance on *Singhal v. City of Wilton Manors*, No. 06-61653-CIV, 2006 WL 8433166 (S.D. Fla. Dec. 14, 2006), which requires the absence of "meaningful administrative review" of a final policyholder, is misplaced. The gravamen of the claim there was the searches themselves, not as they related to a First Amendment retaliation claim. *Id.* at *4. Rather, the more nuanced municipal

action alleged here is the decision to inspect for code violations in an unconstitutional manner, not necessarily enforcement. Indeed, if coupled with a retaliatory animus and causation, this behavior would be all that is necessary to make out a First Amendment claim; it would not matter if a Special Master did not ultimately find a violation.

Furthermore, there is no record evidence that there was meaningful administrative review of the Town Attorney's alleged decision to retaliate through code inspections. Though the contract for services provided that the Sheriff would be tasked with most aspects of code enforcement, the Sheriff nonetheless agreed to confer with the Mayor and the Town Commission regarding code enforcement problems within the Town. Under the contract, the Sheriff "shall accept from the Town Commission general policy direction on how law enforcement and code enforcement services are delivered and to what portion of the municipality a particular type or level of service should be delivered to counteract law and codes enforcement problems within the TOWN." Dkt. 56-1 at 6-7. Arguably the Deputies could have raised the issue of any selective enforcement with the Sheriff for a second opinion, but this hardly constitutes "administrative review."

It moreover defies common sense to argue the Town Attorney possessed no authority in code enforcement matters when there is record evidence he was involved in the matter. Indeed, emails were sent to and from the Town Attorney

and Tom Trask, another lawyer at the law firm retained by the Town, and the Town employees about enforcing code violations at the Café. Dkt. 61-2 at 85-87, 91-93, 103-104. Town Attorney Daigneault further testified he was aware of code enforcement action against Sweet Sage at the time of his deposition on September 30, 2016, and that his partner, Mr. Trask, is "handling [code enforcement against Sweet Sage] from the town attorney's perspective." Dkt. 90-4 at 76-77. Mr. Daigneault also withdrew from the sign ordinance litigation because a previous code enforcement official stated the Town Attorney made enforcement decisions at issue in the case. Dkt. 61-2 at 70-71.

Equally unavailing is the Town's argument that because "ultimately, the Code Enforcement Officer is responsible for deciding whether an issue is a violation or not," Dkt. 82-8 at 4, the enforcement actions were not by policymakers. But an NOV and eventual enforcement action is certainly not an unexpected outcome of an inspection. A reasonable jury could find that implicit in the instruction to inspect is also an instruction to enforce compliance. Such a limited analysis also ignores the fact that, again, the inspections themselves are problematic.

The facts presented here are closer to *Costello v. Town of Huntington*, No. 14-CV-2061(JS)(GRB), 2015 WL 1396448 (E.D.N.Y. Mar. 25, 2015). Allegations in that case concerned retaliation by, among other things, inspections for town

code provisions. *Id.* at *2-3. The court went on to find that the allegations of concerted action by "multiple building inspectors, the Town attorney, and [a] Councilman" plausibly stated a claim for a municipal custom or policy. *Id.* at *7 (citation omitted); *see also Hurley v. Town of Southampton*, No. CV175543(JS)(AKT), 2018 WL 3941944, at *22 (E.D.N.Y. Aug. 13, 2018) (collecting cases in finding complaint sufficiently alleged the town attorney "is a [t]own official who has final policymaking authority with respect to enforcement of . . . the Town code generally[.]"). This is distinct, of course, from a code enforcement officer or even town attorney who possesses no policymaking authority. *See, e.g.*, *Staten v. Vill. of Monticello*, No. 14-CV-4766(KMK), 2015 WL 6473041, at *11 (S.D.N.Y. Oct. 26, 2015); *Norton v. Town of Islip*, 678 F. App'x 17, 22 (2d Cir. 2017).

Indeed, it is the record evidence pointing to concerted action between the Town Attorney and the Commission—and even extending to other government officials—that is most suggestive of *Monell* liability. It is for the jury to determine whether their actions have violated Plaintiffs' First Amendment rights.

2. <u>The Merits of First Amendment Retaliation</u>

A First Amendment retaliation claim requires a plaintiff to establish: "(1) his speech or conduct was constitutionally protected; (2) the retaliatory conduct of the defendant adversely affected the protected speech, in that the retaliation 'would

likely deter a person of ordinary firmness' from engaging in the protected speech; and (3) there is a causal connection between the retaliatory conduct and the protected speech." *Indigo Room, Inc. v. City of Fort Myers*, 589 F. App'x 938, 947 (11th Cir. 2014) (citations omitted). "The causal-connection inquiry asks whether the defendants were subjectively motivated to retaliate because the plaintiffs engaged in protected speech," which in turn requires that the defendants had "actual knowledge" of the protected speech. *Id.* (citations omitted). "Circumstantial evidence of temporal proximity alone is insufficient when there is unrefuted testimony from the defendant that he knew nothing of the protected conduct." *Id.* (citations omitted).

It is undisputed that Mr. Messmore's vocal participation in Town meetings and the litigation concerning the unconstitutional sign ordinance are protected speech. *See, e.g.*, *O'Boyle v. Sweetapple*, 187 F.Supp.3d 1365, 1370-71 (S.D. Fla. 2016). As for speech related to the vacant lot, the Town cites to *Ridgeview Partners, LLC v. Entwhistle*, 227 F. App'x 80, 82 (2d Cir. 2007) and another out-of-circuit case for the proposition that the "informal zoning change 'discussions' and formal variance and site plan applications were not First Amendment 'petitions.'" Dkt. 73 at 19.

The more analogous case, however, is *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83 (2d Cir. 2002), relied upon by *Ridgeview*,

where a plaintiff alleged that a zoning board revoked a previously issued permit because of continued litigation on a related matter. *Id.* at 86-87. The Second Circuit granted him leave to amend his complaint to include a First Amendment retaliation claim. *Id.* at 91-92.

Indeed, Plaintiff's argument is not that the Commission refused to move on his request for rezoning because of the request. Rather, the sign ordinance litigation was the relevant petition and protected speech. Furthermore, the Town sets forth no authority for the proposition that the Town's conduct with the vacant lot is irrelevant as evidence of retaliatory intent more broadly.

Viewed as a whole, the alleged retaliation manifested in code enforcement, a refusal to grant a request for rezoning of the vacant lot, and the drafting and passing of Town ordinances. More specifically:

- Between September 2016 and April 2018, the Town conducted numerous inspections of the Café. *See* Dkt. 73-6. Seating inspections are typically conducted once a year in connection with business tax receipt applications. Dkt. 84-1 at 12.
- The Clerk or Deputy Clerk told Deputy Short to conduct seat counts of the restaurants. Dkt. 82-3 at 4-5.
- The Town instructed Deputies to review Sweet Sage's business tax receipt during the pendency of the sign ordinance litigation. Dkt. 82-8 at 28.
- On September 27, 2016, the Deputy Clerk forwarded information to Deputy Short for a recheck of the Café. Dkt. 61-2 at 107; Dkt. 82-8 at 27. This was days before the Town Attorney's deposition on September 30. This inspection was made. Dkt. 82-8 at 28.
- Though on a prior inspection Deputy Kohmann had determined that the Café was in compliance, the Town Attorney's office instructed him to shorten the time between inspections of the Café. Dkt. 82-2 at 14.

- Deputy Kohmann explained, "It seemed like there was a lot of past issues, you know, going on." Dkt. 82-2 at 19.
- At least one NOV was delivered by hand, which, during Deputy Clerk Schmader's employment, was "the first few times that [the Town had] hand delivered any [NOVs]." Dkt. 61-2 at 108; *see also* Dkt. 82-2 at 14. Deputy Short believed this idea came from the "discretion of the city attorney." Dkt. 82-3 at 8.
- The Town Clerk arranged for Deputy Short to work on a weekend to handle parking enforcement at the vacant lot. *Id.*; Dkt. 82-6 at 9-12.
- The Town proceeded with the failed code enforcement proceeding against the Café in May 2018 when only three other enforcement hearings had occurred since 2007, apparently none of which for parking matters. Dkt. 84-1 at 7.
- After the filing of the sign ordinance litigation, the Commission was frustrated with Mr. Messmore's statements about the case and wanted to ensure that the Town's side of the story was being heard by the public. Dkt. 90-1 at 26-30.
- Notwithstanding a scheduled workshop on Mr. Messmore's request to rezone the vacant lot, the Commission canceled the workshop. This followed summary judgment in the sign ordinance litigation. Dkt. 82-8 at 36-37.
- The Commission also met shortly after summary judgment in the case to discuss appeal. A portion of the transcript, Dkt. 90-2 at 64, reads:

> MAYOR QUEEN: We got it. You know, it's – it's the idea of it that's -- we have the money.
> COMMISSIONER CURTIS: I know. It stinks.
> MAYOR QUEEN: Yeah, it does. It does. But what are we left with? Are we going to give up our town or are we going to try and fight this thing? Because we're going to -- you already see it. You see what could happen. Here's our man. You know, I'm --
> MR. DAIGNEAULT: Tough call.
> COMMISSIONER CURTIS: Is there another lawsuit on the heels of this parking thing because we weren't able to --
> MR. DAIGNEAULT: I'm going to stop you there.
> COMMISSIONER CURTIS: Not at this meeting, okay. I just -- like I said, are we an escalator?
> MR. DAIGNEAULT: All right. I'm going to close the executive session.

- The Town's current counsel, an attorney with the law firm retained by the Town, sent an email to the Town Attorney concerning a proposed ordinance. He wrote, "As to having the [American with Disabilities Act] regs and such, yes, I looked them up last evening to be sure, and we can be sure to print them out and make them part of the backup materials. Just for your info, I didn't need the ADA finding since my actual regulation does not incorporate the ADA standard. So why, you ask, did I add the finding? Because I want him to see that in addition to the count violation, it is likely that his seating does not meet the ADA standards either." The Town Attorney confirmed that "he" refers to Mr. Messmore. Dkt. 82-8 at 41.
- When Plaintiffs challenged the constitutionality of the Business Tax Code, the Town amended it in a way that would still allow unwarranted, unnoticed inspections of the Café. Dkt. 75-4.

In response to the above, the Town suggests it delegated all code enforcement responsibilities to the Sheriff, that enforcement was not selective and indeed other establishments saw repeat inspections (and, most persuasively, that the Café had been repeatedly out of compliance with the parking ordinance), that decisions related to the vacant lot were justified, and that the overlap of inspections with key moments in litigation was coincidental. In this way, the Town attempts to minimize each individual instance but misses the bigger picture. A reasonable jury could, from the entirety of the evidence Plaintiffs have put forward, infer that the Town Attorney and the Commission acted with a retaliatory motive against Mr. Messmore and Sweet Sage. At some point mere coincidence morphs into something else. Where precisely is a question for the jury.

The Town also argues that no conduct "adversely affected" Mr. Messmore. Indeed, he is still vocal at meetings, the sign ordinance litigation was successful,

and, to the extent it is or is not relevant as protected speech, the vacant lot is now

under construction for another business. But this injects a subjective element into

the inquiry, which instead asks whether the retaliation "would likely deter a person

of ordinary firmness" from engaging in the protected speech. Mr. Messmore has

given every indication that he is not a person of ordinary firmness. This factual

question is another for the jury. Summary judgment is not appropriate on

Plaintiffs' Count I.

Count II.     Unreasonable Search and Seizure Against the Town and the Sheriff

Plaintiffs Sweet Sage and SS16725 next claim that "[s]ince August 2016,

Pinellas County Sheriff's deputies, at the direction of the Town, have conducted

approximately thirteen warrantless searches of the Sweet Sage Café and the threat

of additional warrantless searches remains ongoing." Dkt. 56 ¶ 50. Plaintiffs seek

injunctive relief prohibiting warrantless searches or inspections of the Café, an

award of attorney's fees, and costs. *Id.* at 14.

"[T]he Fourth Amendment's prohibition on unreasonable searches and

seizures is applicable to commercial premises, as well as to private homes" and

extends to "administrative inspections designed to enforce regulatory statutes,"

*New York v. Burger*, 482 U.S. 691, 699 (1987). Putting aside the Town's reliance

on the original Business Tax Code as justification for the Deputies' entry, this

record establishes that, during each of the inspections, the Deputies entered a

public restaurant during open hours, did not stray to an "employees only" or "no trespassing" section of the building, did not inspect any books or business records, and were not disruptive.[2]

There is some record evidence that at times patrons were disturbed by the visiting officers. But it is also clear that until May 2018, Mr. and Mrs. Messmore consented or acquiesced. *See United States v. Kapperman*, 764 F.2d 786, 794 (11th Cir. 1985); *see also United States v. Thriftimart, Inc.*, 429 F.2d 1006, 1009 (9th Cir. 1970) (noting that, unlike a criminal case, consent in an administrative inspection is not "inherently suspect"). Mr. Messmore admits he never told the Deputies that they were not allowed to enter the Café to count seats. Dkt. 82-5 at 18. Nor did he or his staff ever tell the Deputies they were not welcome. *Id.* at 22. In fact, after Plaintiffs sent the May 4, 2018 letter "trespassing" Defendants, no officer returned to the Café for code enforcement.

The consent or acquiescence of Plaintiffs means there is no past Fourth Amendment violation to recompense.[3] Nor is prospective injunctive relief appropriate when untethered to a past violation, and the Court fashions appropriate

---

[2] And as for the posting of a citation on the vacant lot, this entry does not constitute a search because it is not designed to "find[] something." *Singhal v. City of Wilton Manors*, No. 06-61653-CIV, 2006 WL 8433166, *2 (S.D. Fla. Dec. 14, 2006) (citation omitted).

[3] Also irrelevant is the constitutionality of the previous iteration of the Business Tax Code that was relied upon by the Town's Attorney. *See Sosa v. Hames*, 581 F.Supp.2d 1254, 1269 (S.D. Fla. 2008) (finding an officer's inspection pursuant to statutory authority did not require a warrant as it occurred during normal business hours and was conducted for the purposes set out in the authorizing statute).

relief for Plaintiffs below concerning Count III. Judgment for the Town and the

Sheriff on Count II is granted.

Count III    Whether the Prior Business Tax Code and Revised Business Tax Code
             Violate the Fourth Amendment

Plaintiffs Sweet Sage and SS16725 challenge the constitutionality of the

Town's prior Business Tax Code and revised Business Tax Code. Dkt. 56 ¶¶ 78-

81. Plaintiffs seek a declaration that the Codes are unconstitutional on their face

and as applied, as well as injunctive relief, attorney's fees, and costs. *Id.* at 18.

In its prior form, Section 66-45 of the Business Tax Code provided that:

> (a) All persons authorized in this section to inspect
> holders of business tax receipt and businesses shall have
> the authority to enter, with or without search warrant, at
> all reasonable times, the following premises:
> (1) Those for which a business tax receipt is required;
> (2) Those for which a business tax receipt was issued and
> which, at the time of inspection, are operating under such
> business tax receipt;
> (3) Those for which the business tax receipt has been
> revoked or suspended.

Dkt. 75-4 at 9. In response to Plaintiffs' challenge to the ordinance (and after

reading the U.S. Supreme Court's opinion in *City of Los Angeles, Cal. v. Patel*,

135 S. Ct. 2443 (2015), *see* Dkt. 73 at 41), the Town amended the provision.

Section 66-43 of the Business Tax Code now requires businesses to "permit

all reasonable regulatory inspections of the licensed premises and business records

by federal, state, county and town inspectors as provided for in section 66-45 of

this article or as otherwise authorized by county, state or federal law." Dkt. 75-4 at

7. As revised, Section 66-45(b) authorizes "regulatory inspections . . . at all

reasonable times, to ensure compliance with town codes":

> (c)(1) Where the code inspector has been invited or has
> otherwise been permitted to enter the premises by the
> owner, manager, employee or other agent with actual or
> apparent authority to control the premises;
> (c)(2) Where the code inspector enters a licensed
> business premises during a time when that business is
> open for business and the code inspector inspects only
> areas of the business which are otherwise open to or
> viewable by customers, delivery personnel, or other
> persons who are invitees of the business;
> (c)(3) Where the code inspector is inspecting a licensed
> business engaged in a closely-regulated industry, and
> where the inspector has a reasonable good faith belief,
> based upon a record of non-compliance or other
> verifiable evidence of probable non-compliance to
> include citizen complaints, that providing advanced
> notice of the inspection may allow the business to
> conceal the code violation which is the subject of the
> inspection;
> (c)(4) Where the code inspector presents an inspection
> warrant.

Dkt. 75-4 at 9. The Business Tax Code goes on to define the term "closely-

regulated industry" as: "[a] firearms retailer . . . ; [a] business which is licensed and

regulated by the Florida Beverage Law as defined in Florida Statutes § 561.01(6);

and [a] public food service establishment licensed under Florida Statutes Chapter

509." *Id.* at 10 (§ 66-45(g)).

These subsection (c)(3) inspections may be conducted four times in twelve months excluding "follow up inspections." *Id.* at 9 (§ 66-45(e)). The section further limits all inspections "to the regulatory purposes for which the inspector is seeking to conduct the inspection." *Id.* (§ 66-45(d)). Additionally, through Section 66-40(a)(1), the Town revised its license or business tax receipt application to require businesses to "attest[] to the truthfulness of the information contained therein and acknowledge[] the requirements of this article." Dkt. 75-4 at 5.

Plaintiffs complain of many features of the revised Business Tax Code, Dkt. 56 ¶¶ 72-80, and bring both a facial and as applied constitutional challenge, *id.* ¶ 81. A facial challenge seeks to invalidate a statute or regulation itself. *Jacobs v. Florida Bar*, 50 F.3d 901, 905-06 (11th Cir. 1995). While facial Fourth Amendment ordinance challenges are not barred, *Patel*, 135 S. Ct. 2443, the Supreme Court has established that a "facial challenge to a legislative [a]ct is . . . the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [a]ct would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

The Court finds that the issue is ripe and that, on its face, subsections (c)(3) and (g) of Section 66-45 are unconstitutional. As applied to the Café that has now revoked consent, warrantless inspections under subsection (c)(2) are unconstitutional. Summary judgment in favor of Plaintiffs is thus appropriate.

1. <u>Ripeness</u>

Article III's ripeness doctrine requires courts to weigh: "(1) the fitness of the issues for judicial decision; and (2) the hardship to the parties of withholding court consideration." *Beaulieu v. City of Alabaster*, 454 F.3d 1219, 1227 (11th Cir. 2006) (citation and quotation marks omitted). Relevant to the fitness and hardship prongs are: "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." *Id.* (citations omitted).

In analyzing the above, the Court is mindful of the unique circumstances of the case. Though the Town has not yet invoked Section 66-45 of the revised Business Tax Code, there is nonetheless a long history of inspections of the Café. This suggests the certain likelihood of future inspections.

These prior inspections were purportedly justified by the Code's precursor. Dkt. 82-8 at 31. What is more, that precursor was amended in direct response to Plaintiffs' challenge to its constitutionality. The Town has further represented that code enforcement officers in the future will be obligated to conduct administrative inspections pursuant to the Code. Dkt. 82-8 at 42. Why else, after all, pass the ordinance? Put simply, the Town is unable to render a constitutional challenge to

an ordinance unripe simply by amending the ordinance and waiting until the dust of litigation settles to use it.

More tangibly, the Town has decided to tie its amended business tax receipt applications (basically the Town's business permit) to the administrative inspections. Mr. Messmore has objected to the practice and has thus not reapplied after his most recent application's rejection. Plaintiffs have thus suffered—and continue to suffer—a concrete harm. *See, e.g.*, Dkt. 75-4 at 7 ("Any person who engages in or manages any business . . . without first obtaining a local business license . . . is subject to a penalty of 25 percent of the business license tax due, in addition to any other penalty provided by law or ordinance . . . ."); *see also* Dkt. 75-4 at 3 ("It shall be unlawful for any person . . . to engage in or manage any business . . . without a business license.").

Delay in resolving the constitutionality of the ordinance would merely put off the inevitable and cause hardship to Plaintiffs. The above considerations distinguish this case from one like *Bayside Enterprises, Inc. v. Carson*, 450 F. Supp. 696 (M.D. Fla. 1978) that was decided in a near factual vacuum. *See also Free Speech Coal., Inc. v. Attorney Gen. United States*, 825 F.3d 149, 167 n.15 (3d Cir. 2016) (noting that ripeness turns on "whether the threat of future harm under the Statutes is sufficiently immediate to constitute a cognizable injury" and finding

ripeness where "the threat of future inspections has caused Plaintiffs to incur ongoing costs to comply with the regulations").

The second and third ripeness factors are also satisfied. Judicial review would not interfere with administrative action, much less "inappropriately." And the factual development of the issue, with voluminous discovery, is comprehensive enough for the Court to rule. Because Plaintiffs' challenge of Section 66-45 of the revised Business Tax Code is fit for review and withholding consideration would cause hardship, the issue is ripe.[4]

2. Plaintiffs' Facial Attack on Subsections (c)(3) and (g)

"Search regimes where no warrant is ever required may be reasonable where 'special needs' . . . make the warrant and probable-cause requirement impracticable" and the "primary purpose of the searches is distinguishable from the general interest in crime control." *Patel*, 135 S. Ct. at 2452 (citations, alterations, and some quotation marks omitted). Here it is clear that the administrative searches authorized by the revised Business Tax Code serve a "special need" other than conducting criminal investigations. *See id.*

But "absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, the subject of the search must be

---

[4] The Court finds no contradiction in holding that the constitutional challenge to the revised Business Tax Ordinance is ripe, though injunctive relief for alleged Fourth Amendment violations inappropriate. As the Court noted, there has not yet been a constitutional violation, which here precludes prospective injunctive relief but not necessarily a constitutional challenge to the ordinance.

afforded an opportunity to obtain precompliance review before a neutral decisionmaker." *Id.* (citations omitted). *Patel* involved a city ordinance that required hotels to maintain certain information of guests and provide that information to law enforcement upon request. *Id.* at 2447-48. The hotel owner could face criminal penalties and be "arrested on the spot" for failing to comply. *Id.* at 2452. The Supreme Court held "only that a hotel owner must be afforded an *opportunity* to have a neutral decisionmaker review an officer's demand to search the registry before he or she faces penalties for failing to comply," and that "[a]ctual review need only occur in those rare instances where a hotel operator objects to turning over the registry." *Id.* at 2453 (emphasis in original).

While it is true that the Code itself provides no criminal sanctions for failing to comply, any violation of the Business Tax Code can result in the Town declining to issue or renew, or revoke or suspend a business license. *See* Dkt. 75-4 at 3. Moreover, aspects of Section 66-45 of the Town's Business Tax Code provide no opportunity for neutral, precompliance review.

Section 66-45 attempts to sidestep this point and *Patel* entirely by its very design. Indeed, for the most part, its subsections merely codify acceptable behavior under the Fourth Amendment.[5] Subsection (c)(1) inspections, for example, are

---

[5] Be that as it may, the existence of constitutional alternatives—indeed, that are precisely in line with Fourth Amendment jurisprudence—will not save a separate unconstitutional provision from facial attack. *Cf. Patel*, 135 S. Ct. at 2451 ("[W]hen addressing a facial challenge to a statute authorizing warrantless searches, the proper focus of the constitutional inquiry is searches that the law actually authorizes, not

consent-based. Dkt. 75-4 at 9. Subsection (c)(2) allows for inspectors to enter a business that is open to the public and inspect only areas that are open and viewable by customers. Subsection (c)(4) allows for an inspection via warrant. And, among other things, subsection (d) codifies the plain-view search doctrine.

Plaintiffs mainly take issue with subsection (c)(3), which picks up where (c)(2) left off by allowing inspectors to also access businesses that are not open to the public (though apparently only during working hours or when occupied, as addressed by subsection (f)). It would also allow inspectors of businesses open to the public to inspect areas that are otherwise not accessible—for example, a concealed kitchen of a restaurant.

The Town, no doubt aware that such broad powers would implicate the Fourth Amendment, expressly limited subsection (c)(3) to establishments in a "closely-regulated industry" for which no precompliance review under *Patel* is required. *Patel*, 135 S. Ct. at 2454. Subsection (g) further defines "closely-regulated industry" as firearms retailers, restaurants, and businesses licensed for alcohol. Dkt. 75-4 at 10.

The "closely regulated industry," however, is "the exception." *Patel*, 135 S. Ct. at 2455 (citation omitted). Indeed, the Supreme Court has noted only four

---

those for which it is irrelevant. If exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute. Statutes authorizing warrantless searches also do no work where the subject of a search has consented.").

industries that "have such a history of government oversight that no reasonable expectation of privacy . . . could exist for a proprietor over the stock of such an enterprise." *Id.* at 2454 (citation omitted). In *Patel*, the Court observed that "[s]imply listing these industries refutes petitioner's argument that hotels should be counted among them. Unlike liquor sales, *Colonnade Catering Corp. v. United States,* 397 U.S. 72 (1970), firearms dealing, *United States v. Biswell,* 406 U.S. 311 (1972), mining, *Donovan v. Dewey,* 452 U.S. 594 (1981), or running an automobile junkyard, *New York v. Burger,* 482 U.S. 691 (1987), nothing inherent in the operation of hotels poses a clear and significant risk to the public welfare." *Patel*, 135 S. Ct. at 2454 (some citations omitted).

As an initial matter, the Town is unable to circumvent the Fourth Amendment's mandate simply by designating a given industry as closely regulated. Though the parties did not fully brief the Court on the extent of the regulatory framework for restaurants, caselaw is instructive, beginning with *Patel*. Regulations require "hotels to, *inter alia,* maintain a license, collect taxes, conspicuously post their rates, and meet certain sanitary standards." *Patel*, 135 S. Ct. at 2455. The same—and not much more—can be said of restaurants. *See generally* Fla. Stat. Ch. 509. And as feared by the Court in *Patel*, finding that a restaurant, or more broadly an establishment that sells food, is part of a closely-regulated industry would allow the exception to swallow the rule. *Id.* at 2454-55.

In contrast, the Town chiefly relies on out-of-circuit, pre-*Patel* cases. *See, e.g.*, *Khurana v. N. Cent. Dist. Health Defendants' Dep't*, No. 3:10-cv-00579-BLW, 2012 WL 1288746 (D. Idaho Apr. 16, 2012); *Aida Food and Liquor, Inc. v. City of Chicago*, No. 03-C-4341, 2005 WL 736015 (N.D. Ill. Mar. 29, 2005); *Players, Inc. v. City of New York*, 371 F.Supp.2d 522 (S.D.N.Y. 2005). Another common trait among these cases is their reliance on *Contreras v. City of Chicago*, 119 F.3d 1286 (7th Cir. 1997), but the appellate court there did not directly address the district court's finding that restaurants operate in a closely-regulated industry. 119 F.3d at 1290. The district court, meanwhile, was not presented with any argument to the contrary and relied on two cases: one made no mention of the amount of regulation of the food industry, much less as it relates to the Fourth Amendment, *see United States v. Acri Wholesale Grocery Co.*, 409 F. Supp. 529, 533 (S.D. Iowa 1976) ("[T]he Court believes that once the validity of the inspection is established, the propriety of a photographic 'search' is coextensive with the validity of the inspection[.]"), and the other looked to the "food and drug industry" as a single entity yet cited no actual regulations, *United States v. New England Grocers Supply Co.*, 488 F. Supp. 230, 238 (D. Mass. 1980). *Contreras v. City of Chicago*, 920 F. Supp. 1370, 1389 (N.D. Ill. 1996).

The fact that a restaurant might sell some alcoholic beverages does not change the calculus. As such, the Town's reliance on *Indigo Room, Inc.* is

misplaced. A restaurant is by no means a "liquor establishment." *Indigo Room, Inc.*, 589 F. App'x at 945. In fact, the original source of the alcohol industry's "closely regulated" designation, *Colonnade Catering Corp.,* 397 U.S. 72, involved a catering establishment whose operator was a licensee authorized to serve alcohol and the holder of a retail liquor dealer's occupational tax stamp. *Id.* at 72. The Supreme Court, moreover, had before it evidence of "the long history of the regulation of the liquor industry" dating back to England and the American Colonies, which has included laws granting federal officers "broad powers to inspect distilling premises and the premises of the importer without a warrant," and "to make warrantless searches and seizures of articles under the liquor laws." *Id.* at 75.

Yet even a finding that a restaurant is in a closely-regulated industry would not end the Court's inquiry. For a warrantless search of such a business to be valid: (1) "there must be a 'substantial' government interest that informs the regulatory scheme pursuant to which the inspection is made"; (2) "the warrantless inspections must be 'necessary' to further [the] regulatory scheme"; and (3) "the statute's inspection program, in terms of the certainty and regularity of its application, [must] provid[e] a constitutionally adequate substitute for a warrant." *Burger,* 482 U.S. at 702-703 (citation omitted) (alterations in original). The *Burger* Court went on to explain the third factor:

> [T]he regulatory statute must perform the two basic functions of a warrant: it must advise the owner of the commercial premises that the search is being made pursuant to the law and has a properly defined scope, and it must limit the discretion of the inspecting officers. To perform this first function, the statute must be sufficiently comprehensive and defined that the owner of commercial property cannot help but be aware that his property will be subject to periodic inspections undertaken for specific purposes. In addition, in defining how a statute limits the discretion of the inspectors, we have observed that it must be carefully limited in time, place, and scope.

*Id.* at 703. (citations and quotation marks omitted). "The primary purpose of the Fourth Amendment in this context is to protect citizens from the unbridled discretion [of] executive and administrative officers." *Indigo Room, Inc.*, 589 F. App'x at 945 (citation omitted) (alteration in original).

But unlike the finely-tuned regulatory schemes in the above cases, with roughly one page the Town's ordinance purports to apply equally to all licensed businesses in three discrete industries. *Compare* Dkt. 75-4 at 9 *with Burger*, 482 U.S. 691 (New York law targeted at vehicle industry); *Biswell*, 406 U.S. 311 (the Gun Control Act of 1968); *Dewey*, 452 U.S. 594 (the Federal Mine Safety and Health Act of 1977); *Colonnade*, 397 U.S. 72 (federal law targeted at alcohol industry). If that were not enough, the inspections can be for enforcement of any provision of the code. Dkt. 75-4 at 9. This runs the gamut from animal control and burning garbage to planting trees and hedges, not to mention parking. Code of the Town of North Redington Beach, Florida (available at

https://library.municode.com/fl/redington_beach/codes/code_of_ordinances?nodeId=COORTOREBEFL). This unprecedented breadth is a flaw that infects all of subsection (c)(3), not just as applied to restaurants.

No matter how "severe" the Town's shortage of parking, it is unconvincing to compare this and likely most other code provisions to the dangers of mining and firearms. But even assuming the Town has a "substantial interest" in enforcing its code writ large, it is not clear that warrantless inspections are "necessary" to further this scheme. This is partly because Florida already has a comprehensive procedure to allow for state or local officials to obtain an inspection warrant to check non-residential structures for code compliance. Fla. Stat. §§ 933.20-933.30.

An inspection warrant requires "cause, supported by affidavit particularly describing the place, dwelling, structure, or premises to be inspected and the purpose for which the inspection is to be made. In addition, the affidavit shall contain a statement that consent to inspect has been sought and refused or a statement setting forth facts or circumstances reasonably justifying the failure to seek such consent." § 933.21. A judge issues the warrant, which is effective for up to 14 days without extension. §§ 933.23-933.25. "When prior consent has been sought and refused, notice that a warrant has been issued shall be given at least 24 hours before the warrant is executed," though immediate execution is available

"when necessary to prevent loss of life or property." § 933.26. Willfully refusing a warranted inspection is a second-degree misdemeanor. § 933.27.

Of course, the availability of a statutory regime for inspection does not necessarily invalidate a different one. *See* § 933.29 ("Nothing contained herein shall be construed to restrict . . . inspections with or without warrant as authorized by general law."). The Town also stresses that the State's mechanism is ineffective because, with 24 hours' notice, an offending business could simply bring itself into compliance (in Plaintiffs' case, by removing a few chairs) before the inspection, pass inspection, then fall outside of compliance immediately thereafter.

Courts have rejected similar arguments. *See, e.g.*, *Patel*, 135 S. Ct. at 2453, 2456 (collecting cases). The Town is correct, however, that the Eleventh Circuit in *Crosby v. Paulk*, 187 F.3d 1339 (11th Cir. 1999) looked to Supreme Court precedent in finding that, for inspections to root out underage drinking, "[r]equiring inspectors or other law enforcement agents to obtain warrants before conducting an investigation might alert nightclub and bar owners to the impending inspection, which would defeat the purpose of the inspection." 187 F.3d at 1347; *see also Burger*, 462 U.S. at 710; *Dewey*, 452 U.S. at 603; *Biswell*, 406 U.S. at 316. But the government actors in *Crosby* were operating pursuant to a tailored regulatory regime—the Georgia Alcoholic Beverage Code—and their search was in furtherance of that scheme.

This brings the Court back to the third factor in *Burger*. The Town's ordinance provides no check on unbridled discretion by defining the scope of any inspection. Because of this, it is not a constitutionally adequate substitute for a warrant.

The Court does commend the ordinance's internal limitations. It requires, for instance, "a reasonable good faith belief, based upon a record of non-compliance or other verifiable evidence of probable non-compliance . . . that providing advance notice of the inspection may allow the business to conceal the code violation which is the subject of the inspection." Dkt. 75-4 at 9. Inspections can only be conducted during reasonable times. *Id.* And officials can only invoke (c)(3) four times in twelve months.[6] *Id.*

But, as mentioned above, there is nothing in the provision that restricts an inspection of an establishment in a closely-regulated industry to matters relevant to that regulation. It allows, in other words, for a general search or inspection that is

---

[6] Perhaps counterintuitively, this last limitation might actually militate against Fourth Amendment reasonableness because the ordinance's language does not put business owners on notice that their business will be inspected regularly. *See, e.g.*, *Dewey*, 452 U.S. at 605 (noting the statute "clearly notifies the operator that inspections will be performed on a regular basis" in finding no constitutional violation); *Burger*, 482 U.S. at 711 (statute stating that inspections occur on a regular basis shows owner that inspections are not discretionary); *but see Patel*, 135 S Ct. at 2463 (Scalia, J., dissenting) ("But the warrantless police searches of a business '10 times a day, every day, for three months' that the Court envisions under Los Angeles's regime . . . are entirely consistent with the regimes in *Dewey* and *Burger*; 10 times a day, every day, is 'at least four times a year,' and on a (much too) 'regular basis.'").

not properly defined. The facts presented here paint a vivid example of this fatal infirmity.

The Café serves some alcoholic beverages, though it closes at 2:00 p.m. Because alcohol is a closely-regulated industry, the Town argues, code enforcement officers can enter the Café to count its seats—a matter entirely unrelated to alcohol. Contrary to the Town's assertion at oral argument, this kind of bootstrapping is not sanctioned by *Indigo Room, Inc. See* 589 F. App'x at 946 (finding no evidence "to support Appellants' contention that the inspections were for a purpose other than learning whether the [bar] was conforming to the alcoholic-beverage laws, including the Ordinance"). Even if the Court were to deem restaurants to be in a closely-regulated industry, enforcing a parking ordinance is still unrelated to alcohol or to food.

Rather, there must exist some nexus between the heavy regulation that diminishes a business's reasonable expectation of privacy and the ensuing inspection. *Cf. Dewey*, 452 U.S. at 601 (noting that fatal to the statute in [*Marshall v. Barlow's, Inc.*, 436 U.S. 307 (1978)] was its failure to "tailor the scope and frequency of . . . administrative inspections to the particular health and safety concerns posed by the numerous and varied businesses regulated by the statute"); *Burger*, 482 U.S. at 711-12; (upholding inspections in closely-regulated vehicle-dismantling industry where statute limited examinations to vehicles, parts, and

records); *Biswell*, 406 U.S. at 316 ("When a dealer chooses to engage in this pervasively regulated business [of firearms] and to accept a federal license, he does so with the knowledge that his *business records, firearms, and ammunition* will be subject to effective inspection.") (emphasis added).

In a similar vein, whether a business consents for inspection as part of an alcohol licensing scheme is irrelevant. In applying for alcohol licensure, for instance, Mr. Messmore agreed that the Café "may be inspected and searched during business hours or at any time business is being conducted on the premises without a search warrant by officers of the Division of Alcoholic Beverages and Tobacco, the Sheriff, his Deputies, and Police Officers *for the purposes of determining compliance with the beverage and retail tobacco laws*." Dkt. 83-2 at 104 (emphasis added); *see also Crosby*, 187 F.3d at 1347 (quoting O.C.G.A. § 3-2-32)). As admitted by counsel at oral argument, the Town is not involved in alcohol code enforcement. *See also Watson v. Abington Twp.*, 478 F.3d 144, 152 (3d Cir. 2007) (noting that statute allowed liquor control board to inspect a tavern and cite a violation of any law, including the liquor code, but that there was no proof the board was involved in the challenged inspections).

Rather, a business owner subject to an unnoticed inspection under subsection (c)(3) is "left to wonder about the purposes of the inspector or the limits of his task." *Biswell*, 406 U.S. at 316. The only restraint on an inspection's scope appears

to be subsection (d)'s limit "to the regulatory purposes for which the inspector is seeking to conduct the inspection," but this vague clause cannot singlehandedly save subsections (c)(3) and (g).

Nor is the Town able to extract from its business owners a waiver of their Fourth Amendment rights through the mandatory business tax receipt application. *See Thorobred, Inc. v. Louisville/Jefferson Cty. Metro. Gov't*, No. 3:04CV-193-JDM, 2005 WL 2429079, at *4 (W.D. Ky. Sept. 30, 2005) (finding ordinance requiring consent for a liquor license unconstitutional where it does not expressly limit inspections and searches "for violations of the applicable alcoholic beverages laws and regulations"); *Float-Rite Park, Inc. v. Vill. of Somerset*, 2001 WI App 113, ¶ 15, 244 Wis. 2d 34, 46, 629 N.W.2d 818, 824 (citation omitted) (finding consent for inspection invalid "because a state actor cannot constitutionally condition the receipt of a benefit, such as a . . . business license, on an agreement to refrain from exercising one's constitutional rights"); *Makula v. Vill. of Schiller Park, IL*, No. 95 C 2400, 1998 WL 246043, at *7 (N.D. Ill. Apr. 30, 1998) (striking as unconstitutional license's requirement of consent to administrative inspections); *cf. Pentco, Inc. v. Moody*, 474 F. Supp. 1001, 1009 (S.D. Ohio 1978) ("Nor does this Court question the city's ability to require an inspection as a condition precedent to the issuance of a license and 'prior to operating a business.' Once an inspection has been had and a license issued, however, the Court believes

that further searches require a warrant absent consent."). This aspect of the business tax receipt application similarly falls.

3. <u>The Remedy</u>

The Court does not take its task lightly. Ordinance 2018-804 does include a severability provision should any part of the Ordinance be found unconstitutional or otherwise legally invalid. Dkt. 75-4 at 10. There is, moreover, a presumption for severability so long as "what remains after severance is fully operative as a law." *INS v. Chadha,* 462 U.S. 919, 931 (1983) (citation omitted). Indeed, apart from subsections addressed above, the ordinance seems innocuous. This is not a case like *Wal Juice Bar, Inc. v. City of Oak Grove, Ky.*, No. 5:02CV-252-R, 2008 WL 1730293, at *20-21 (W.D. Ky. Apr. 10, 2008) where essential portions of the law were stricken.

The Court finds that the appropriate remedy is to strike the offending language from the ordinance and the business tax receipt applications; the rest remains intact. Because of this, the Court need not determine the constitutionality of the prior Business Tax Code. The Town is enjoined from inspecting the Café or any business under subsection (c)(3) of Section 66-45.

4. <u>Inspections of the Café Under Subsection (c)(2)</u>

At least as applied to the Café, the Constitution also precludes inspections pursuant to subsection (c)(2). This brings the Court to two companion cases,

*Camara v. Mun. Court of City & Cty. of San Francisco*, 387 U.S. 523 (1967) and *See v. City of Seattle*, 387 U.S. 541, 545 (1967). *Camara* involved a leaseholder's refusal to allow housing inspectors to enter without a warrant. 387 U.S. at 540. The U.S. Supreme Court held that the leaseholder "had a constitutional right to insist that the inspectors obtain a warrant to search and that appellant may not constitutionally be convicted for refusing to consent to the inspection." *Id.*

The commercial inspection in *See*, meanwhile, was "part of a routine, periodic city-wide canvass to obtain compliance with Seattle's Fire Code." 387 U.S. at 541. The Court in *See* "conclude[d] that administrative entry, without consent, upon the portions of commercial premises which are not open to the public may only be compelled through prosecution or physical force within the framework of a warrant procedure." *Id.* at 545; *see also Patel v. City of Los Angeles*, 738 F.3d 1058, 1063 (9th Cir. 2013), *aff'd*, 135 S. Ct. 2443 ("When the government seeks access to non-public areas of a business to enforce health and safety regulations, an administrative search warrant is generally required before that greater level of intrusion is permitted."). The unanswered question is whether a business owner can object to a warrantless administrative inspection or search in the area of a business open to the public. As applied on these facts to the Sweet Sage Café, the answer is yes.

As feared by the Supreme Court in the hotel context of *Patel*, there is a risk that continued inspections—whether or not they rise to the level of a "search"—can be "used as a pretext to harass" business owners and their customers. *Patel*, 135 S. Ct. at 2452-53; *cf. Lesser v. Espy*, 34 F.3d 1301, 1309 (7th Cir. 1994) ("[O]nce an individual begins to receive distinctive treatment without apparent justification (such as more inspections than the regular schedule would indicate) oversight such as that provided by the warrant process may be required to assure that the inspected's Fourth Amendment guarantees are met.") (citations omitted).

This precise issue is captured by Sweet Sage's First Amendment retaliation claim. To again borrow language from *Patel*, there is no limiting force in the Town's ordinance to prevent (c)(2) inspections "10 times a day, every day, for three months." *Patel*, 135 S. Ct. at 2452-53. It would be absurd to allow such a practice simply because counting seats does not rise to a "search"; rather, it is the repeated entry and inspection over the owner's objection—inconsistent with Florida's existing statutory regime for inspections—that offends the Fourth Amendment. In other words, Mr. Messmore has a reasonable expectation of privacy against such inspections.

Although fairly unique to the Town/Sweet Sage dispute, this is not as novel as it might seem. In *Toledo v. Bateson*, 614 N.E.2d 824, 827 (Ohio Ct. App. 1992), for example, a city inspector cited a business owner for failing to display a "no

smoking" sign in her beauty salon. 614 N.E.2d at 825. The inspection of the salon, which was open to the public, was conducted over the owner's objection. *Id.* Affirming suppression of evidence, the court noted the relevant authorizing code section: "The Administrator or other member of the Agency *may enter at any reasonable time, with reasonable notice* into or upon any private or public property . . . for the purpose of inspection . . . ." *Id.* at 826 (emphasis in original). The court reasoned that "the fact that [the code] permits entry onto premises for inspection only 'with reasonable notice' makes patent the intention of the drafters of the ordinance that [the owner] is to be afforded a privacy interest for her place of business." *Id.* at 827.

The officer, in this sense, "stands in no better position than a member of the public." *Barlow's, Inc.*, 436 U.S. at 315. At least on the facts of this case, so too is he unable to enter for inspection over an owner's notice of trespass and without an administrative or other warrant.

This finding is in accord with opinions by the Office of the Florida Attorney General. *See Am. Home Assur. Co. v. Nat'l R.R. Passenger Corp.*, 908 So. 2d 459, 473 (Fla. 2005) (noting that an Attorney General opinion "is entitled to careful consideration and generally should be regarded as highly persuasive"). Citing *See* v. *City of Seattle*, 387 U.S. 541, and Florida's state inspection regime, the Florida Attorney General has more than once opined that "a municipal code inspector is

without authority to *enter onto* any private, commercial, or residential property to assure compliance with or to enforce the various technical codes of the county or to conduct any administrative inspections or searches without the consent of the owner or the operator or occupant of such premises, or without a duly issued search or administrative inspection warrant." Fla. Att'y Gen. Op. 2002-27 (2002), 2002 WL 508796 (emphasis added); Fla. Att'y Gen. Op. 1984-32; *cf. Beverly v. Div. of Beverage of Dep't of Bus. Regulation*, 282 So. 2d 657, 660 (Fla. 1st DCA 1973) ("The fact that two different Attorney Generals have reached the same conclusion with respect to the exact issue now before us lends considerable persuasive influence to their opinions and weighs heavily in favor of our conclusion herein.").

The persuasive Florida Attorney General opinions are certainly most applicable and cogent when they apply to the conduct of low-level state actors such as the Town. *See State v. Family Bank of Hallandale*, 623 So. 2d 474, 478 (Fla. 1993) (citation omitted) ("The official opinions of the Attorney General, the chief law officer of the state, are guides for state executive and administrative officers in performing their official duties until superseded by judicial decision."). The opinions further highlight a thread that runs throughout the U.S. Supreme Court's administrative search jurisprudence: an unconsented administrative inspection (with rare exceptions) must be subject to precompliance review. *Patel*, 135 S. Ct.

at 2451-52. As Professor LaFave has noted, under *See v. City of Seattle*, "in the absence of consent to conduct such an [administrative] inspection [for an unsafe condition/code violation] a warrant would be required, albeit one issued under a "flexible standard of reasonableness." 5 W. LaFave, Search and Seizure at 59 (5th ed. 2012). Fortunately, Florida's statutory administrative inspection scheme provides for such review, while the Town's ordinance does not.

The full panoply of Florida administrative inspection remedies is available to the Town. Consistent with the Florida Attorney General opinions and at least as applied to the nonconsenting Café on these facts, the Town must follow the Florida statutory scheme for inspections and may not rely on subsection (c)(2) to inspect the Sweet Sage Café.

Count IV.    Common Law Trespass Against the Town and the Sheriff

Plaintiffs Sweet Sage and SS16725 next bring a claim of trespass under Florida common law. Reciting language from Count II, Plaintiffs allege that Defendants have "repeatedly, without permission and in disregard for the property rights of [Plaintiffs], entered the Sweet Sage Café causing substantial disturbance to the business." Dkt. 56 ¶ 85. Though a trespass action does not necessarily require a "search," the same considerations guide the Court's analysis.

"Civil trespass to real property occurs when there is an injury to or use of the land of another by one having no right or authority." *Gunning v. Equestleader.com,*

*Inc.*, 253 So. 3d 646, 648 (Fla. 2d DCA 2017) (citation omitted). Consent is a defense to trespass. *See Fla. Pub. Co. v. Fletcher*, 340 So. 2d 914, 917 (Fla. 1976).

As mentioned above, the Deputies entered the Café to count seats in the area open to the public. No one at the Café ever told them to leave. Mr. Messmore even admitted that, prior to the May 2018 letter, he had "never accused them of trespassing" and did not believe they had committed trespass. Dkt. 82-5 at 19. Again, in the absence of any liability, prospective injunctive relief is inappropriate. Judgment in favor of Defendants is granted on Count IV.

Count V.    Declaratory Relief on Revised Business Tax Receipt Ordinance

In their final count, Plaintiffs seek a declaration that Ordinance 2018-804 violates Florida law. Dkt. 56 at 22. Plaintiffs observe that, "[p]ursuant to Section 205.042, Florida Statutes, prior to adopting an ordinance levying a business tax, a municipality must publish a notice between the first and last reading of [the] ordinance in a newspaper of general circulation within its jurisdiction and the notice must contain the proposed classifications and rates applicable to the business tax." *Id.* ¶ 92. Plaintiffs argue that the Town's notice on the new ordinance did not include the classifications and rates as required.

Plaintiffs additionally allege that the Town lacks authority to do the following: levy taxes outside the authority delegated to municipalities by statute under Chapter 205, *id.* ¶ 94; reinstate the use of the term "business license" after it

has been eliminated by the Florida legislature, ¶ 95; require businesses to provide information irrelevant for the computation of business, such as the number of seats, ¶¶ 97-98; require businesses to attest to the truthfulness of information that will be utilized in the enforcement of the Town Code, ¶ 99; or require businesses to consent to inspections of business records, by federal state, county and Town inspectors, ¶ 100.

The Court agrees with the Town that Ordinance 2018-804 did not itself levy a business tax that, indeed, had existed before the ordinance. Ordinance 2018-804 merely clarifies on whom the prior existing tax applies and revises the process and standards of applying for a business tax receipt. *See* Dkt. 75-4 at 3. Because no rates or classifications were created or changed, the additional requirements of Chapter 205 do not apply. Plaintiffs' reliance on *Broward Cty., Fla. Bd. of Cty. Comm'rs. v. Burnstein*, 470 So. 2d 793, 794 (Fla. 4th DCA 1985), a case where a new ordinance doubled levied taxes, is inapplicable.

As a general matter, Florida municipalities possess broad authority to enact ordinances. *City of Hollywood v. Mulligan*, 934 So. 2d 1238, 1243 (Fla. 2006) (citing Florida Constitution, Art. VIII, § 2(b); Fla. Stat. § 166.021(1), (3)(c), (4)). "Under its broad home rule powers, a municipality may legislate concurrently with the Legislature on any subject which has not been expressly preempted by the State." *Id.* (citations omitted). Preemption may also be implied "when the state

legislative scheme is pervasive and the local legislation would present a danger of conflict with that pervasive scheme." *D'Agastino v. City of Miami*, 220 So. 3d 410 (Fla. 2017) (citation omitted).

The provisions of Ordinance 2018-804 do not seem to implicate matters either expressly or implicitly preempted by the State. Plaintiffs, moreover, do not cite persuasive authority in support of most complaints against the Ordinance. For example, it is not immediately clear to the Court why a municipality cannot require seating information, which is relevant to a code provision, on an application for a business tax receipt. While Plaintiffs argue that nothing in Chapter 205, Florida Statutes, authorizes this and other requirements the ordinance imposes, it is equally true that nothing expressly forbids such conditions.[7] As for the nomenclature of "license" to replace "tax receipt," the Court finds that such a technical point cannot invalidate the entire Ordinance. Summary judgment is granted on Count V in favor of the Town.

## CONCLUSION

The Court GRANTS and DENIES in part the Town's motion for summary judgment, Dkt. 73, GRANTS the Sheriff's motion for summary judgment, Dkt. 81, and GRANTS Plaintiffs' motion for summary judgment, Dkt. 71. The Clerk is

---

[7] The Court need not address the ordinance provisions that implicate the Fourth Amendment and have been stricken, thereby mooting Plaintiffs' complaints at paragraphs 96 and 101.

directed to enter judgment in favor of Defendants on Counts II and IV of the Second

Amended Complaint, thereby closing the case against the Sheriff. The Clerk is

further directed to enter judgment in favor of Plaintiffs on Count III. Subsection

(c)(3) of Section 66-45 of the Town's Business Tax Code is deemed

unconstitutional. The Town is hereby enjoined from inspecting the Café or any

business under subsection (c)(3) of Town Code Section 66-45. The Town is also

ordered to remove the following language from its business tax receipt application:

> and that as a condition of the privilege of conducting
> business within the Town, consent to the Town's Code
> Enforcement Officer to periodically conduct inspections
> of the business premises during business hours to
> confirm information provided in this Application is true,
> and to verify that the business is complying with Town
> code provisions governing the business's condition,
> conduct and operations, is hereby given.

The Town is further enjoined from inspecting the Café pursuant to Town Code

Section 66-45, subsection (c)(2). The Clerk is further directed to enter judgment in

favor of the Town on Count V. Only Count I against the Town remains for trial.

This Order has no limiting effect upon any administrative searches/inspections under the Florida Statutes by whomever performed, nor proper warrantless searches or inspections under the beverage laws, appropriate criminal laws, etc.

**DONE AND ORDERED** at Tampa, Florida, on March 29, 2019.


*/s/ William F. Jung*_____
**WILLIAM F. JUNG**
**UNITED STATES DISTRICT JUDGE**


<u>**COPIES FURNISHED TO:**</u>
Counsel of Record